# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

FRANK JOE JIMENEZ, III,      §
(TDCJ-CID #1013080)      §
       Plaintiff,      §
     §
v.      §     CIVIL ACTION NO. H-05-3123
     §
MS. BURT, *et al.*,      §
       Defendants.      §

## MEMORANDUM AND OPINION

Frank Joe Jimenez, an inmate of the Texas Department of Criminal Justice - Correctional Institutions Division, sued in September 2005, alleging civil rights violations resulting from a failure to protect, denial of medical care, retaliation, and conspiracy. Jimenez, proceeding *pro se* and *in forma pauperis*, sues Roberta Burt, Correctional Officer III at the Byrd Unit; Joseph Blanton, Major at the Byrd Unit; Warden Goodwill; William Samarneh, infirmary director; Hung Dao, physician at the Byrd Unit; Robin Hudson, correctional clinic associate at the Holliday Transfer Facility; and Beverly Thomas, building captain at the Byrd Unit.

Jimenez filed a More Definite Statement on March 28, 2006 in accordance with this court's order. (Docket Entry No. 18). Jimenez filed a motion to amend his complaint on August 18, 2006. (Docket Entry No. 22). Because Jimenez sought to

name defendants and claims different from those in his original complaint and more definite statement, this court denied the motion. (Docket Entry No. 28). The court ordered service of process as to Defendants Burt, Blanton, Thomas, Dao, Samarneh, and Hudson on October 24, 2007. (Docket Entry No. 27). The Defendants filed their motion for summary judgment on April 1, 2008. (Docket Entry No. 35).

On April 11, 2008, this court granted Jimenez's motion for extension of time. (Docket Entry No. 36). In a letter dated April 14, 2008, Jimenez stated that he had not filed a motion for extension of time and that this court incorrectly stated that he had filed such a motion. (Docket Entry No. 37). On August 26, 2008, this court granted Jimenez an extension until September 30, 2008, to file his response. (Docket Entry No. 39). On September 3, 2008, Jimenez states that he was transferred from the Darrington Unit to the Jester IV Unit, which is a psychiatric facility. (Docket Entry No. 41). Jimenez explains that when he received his personal property on August 4, 2008, he discovered that his legal materials including the Defendants's motion for summary judgment were missing. (*Id.*). Jimenez complains that he has had difficulty obtaining certain legal books. He states that he was provided with a legal text and was required to return it the next morning. He claims that prison officials have either lost or confiscated his materials. Jimenez asks for help and advice as to how to proceed.

This court will not further delay adjudication of this lawsuit. The Defendants' motion for summary judgment has been pending in this court for many months. On October 24, 2007, this court ordered Jimenez to file a response to the Defendants' motion for summary judgment within forty-five days. (Docket Entry No. 27). Jimenez's response was due on May 15, 2008. Jimenez's letters indicate that he was transferred to the Jester IV Unit on May 27, 2008, several days after his response was due. Jimenez acknowledges that he received the Defendants' summary judgment motion. Jimenez offers no explanation for his failure to respond prior to his transfer to the Jester IV Unit. Jimenez does not explain why he waited until August 2008 to advise the court of his unit transfer and why he waited until September 2008 to advise the court that he did not have access to the motion for summary judgment filed by the Defendants.

Jimenez has had ample time to seek assistance or to try to prepare a response on his own. Jimenez's constructive motions for extension of time, (Docket Entry Nos. 41 & 42), are denied. Jimenez has filed a six-page Complaint, (Docket Entry No. 1), a twenty-four-page Memorandum in Support of Complaint, (Docket Entry No. 2), and an eighteen-page More Definite Statement. The court will liberally construe the pleadings filed by Jimenez as his response.

Based on the pleadings, the motion, the summary judgment record, and the applicable law, this court grants the Defendants' motion for summary judgment. Final judgment is entered by separate order. The reasons for these rulings are stated below.

## I.   Jimenez's Allegations

Jimenez alleges that on January 6, 2004, at the Byrd Unit, Officer Burt ordered Jimenez to enter a cell and remove a mattress. Officer Burt was the picket officer in charge of opening and closing doors. Officer Burt opened the cell door halfway, and Jimenez went in sideways to enter the cell. Jimenez claims that when Officer Burt saw the mattress and Jimenez's body, she closed the door. Officer Burt was approximately twenty yards from Jimenez's cell. Jimenez states he was pinned in the door for one or one and one half minutes. Jimenez tried to push the 500-pound door back, and injured his back in the process. Officer Burt held down the roller in an effort to trap Jimenez. Jimenez and other inmates began screaming for the door to be opened. When the door was opened, Jimenez fell to the floor clutching his chest and left knee. Jimenez asked Officer Brownley for help, but she refused to call a ranking officer. Jimenez asserts that Officer Burt and Officer Brownley were friends and would cover up for each other. Officer Cooper came to see who was causing all the commotion. Officer Cooper quit his job because he feared being sued by Jimenez. Jimenez believes that Officer Cooper concealed the information about Jimenez's injuries. Officer Cooper obtained

statements from inmates concerning the incident with the cell door.  The statements indicated that Officer Burt trapped Jimenez in the cell door for two or three minutes. Motivated by evil intent, Warden Heuzell and Assistant Warden Goodwill destroyed the statements taken from the inmates.

Soon after the incident with the cell door, Jimenez was taken to the infirmary where a nurse gave Jimenez aspirin and scheduled an appointment.  The following day, Dr. Dao examined Jimenez's knee, asked him to move his leg inward and outward, and said, "you're okay."  Dr. Dao gave Jimenez Ibuprofen for the pain.  Two weeks later, Jimenez complained of the continuing pain and possible damage to his kidneys from the Ibuprofen.  Dr. Dao prescribed endomethicin.  Jimenez complains that Dr. Dao removed his work restrictions without consulting Jimenez.  Jimenez continued to complain about his knee pain for one and one half years.  Jimenez did receive x-rays. Jimenez complains that the x-rays do not show the flow of blood and pinched nerves in his knee, and that an MRI or CAT scan would be the best way to see what was truly wrong with his knee.

Jimenez states that he tried to play handball, and was unable to do so because of his knee pain.  Another inmate told Jimenez to wrap his knee to alleviate the pain. After the game, Jimenez took pain medications.  Jimenez states that he loved handball and was the number two player at the Byrd Unit.  Jimenez states that though his knee

was injured, he continued to play handball.  He states that it is human nature to try to do things that one should not do.  (Docket Entry No. 2, p. 10).

Jimenez reinjured his knee while carrying a bucket.  Nurse Hudson refused to allow Jimenez to see the doctor.  Jimenez claims that Nurse Hudson retaliated against him by denying him access to the infirmary.  Jimenez complains that Nurse Hudson kept canceling Jimenez's appointments, and he had to wait four days before seeing the doctor.  Jimenez complained to Captain Wilson, but Captain Wilson took no corrective action against Nurse Hudson because he was dating her.   Jimenez claims that Nurse Hudson and Officer Burt were friends.  Officer Burt wrote two disciplinary cases against Jimenez, but they were dismissed.  Then Officer Burt closed Jimenez in the cell door.  Officer Burt said she would shoot Jimenez if he ever complained.        Dr. Dao said there was nothing wrong with Jimenez's knee.  The medical staff at the Byrd Unit spread false rumors about Jimenez, and the medical staff of the Estelle Unit also denied care for Jimenez's knee.  Prison officials are motivated by evil intent.  Jimenez complains that he only has 60 percent usage of his knee.  For one year and eight months, Jimenez has tried to see a specialist who could tell Jimenez his physical limitations.

Jimenez complains that Major Blanton caused Jimenez to miss his parole date.  He changed Jimenez's work assignment from a janitor to kitchen staff.  He also altered

Jimenez's housing assignment by moving him from G2 to G4.  Officers reassigned Jimenez to a different cell and confiscated legal materials.    Jimenez is now working in the field.  Prison officials charged Jimenez with refusing to work.  This caused Jimenez to miss the parole date.  Jimenez fears that prison officials will retaliate against him by transferring him to a violent unit.

Jimenez seeks a declaratory judgment that defendants violated his civil rights; a permanent injunction prohibiting the defendants from offering their opinion that there is nothing wrong with Jimenez; compensatory damages in the amount of $61,000; and punitive damages in the amount of $56,000.  Jimenez also requests an MRI, CAT scan, and surgery on his knee.

The Defendants move for summary judgment on Jimenez's claims.  The claims and challenges are addressed below.

## II.    The Defendants' Motion for Summary Judgment

### A.    The Legal Standard

Summary judgment is proper under Rule 56, Federal Rules of Civil Procedure, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  If the moving party meets the

initial burden of showing that there is no genuine issue of material fact, the burden shifts to the nonmoving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial. *Id.* at 322-24; Rule 56(e); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). The nonmoving party "cannot satisfy this burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Freeman v. Texas Dep't of Crim. Justice*, 369 F.3d 854, 860 (5th Cir. 2004).

Courts must consider the record as a whole, considering all pleadings, depositions, affidavits, and admissions on file in the light most favorable to the non-movant. *Caboni v. General Motors Corp.*, 278 F.2d 448, 451 (5th Cir. 2002).

The party seeking summary judgment bears the initial burden of demonstrating an absence of a genuine issue of material fact and informing the court of the basis for its motion by identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which support its contention. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Williams v. Adams*, 836 F.2d 958, 960 (5th Cir. 1988). Any controverted evidence must be viewed in the light most favorable to the non-movant, and all reasonable doubts must be resolved against the moving party. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

If the moving party makes the required showing, then the burden shifts to the non-movant to show that a genuine issue of material fact remains for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986); *Fields v. City of S. Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991). The non-movant cannot merely rest on the allegations of the pleadings, but must establish that there are material controverted facts in order to preclude summary judgment. FED. R. CIV. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). Summary judgment is proper if the non-movant fails to make a showing sufficient to establish the existence of an element essential to his case on which he bears the burden of proof. *Celotex*, 477 U.S. at 322-23; *Conti Commodity Servs., Inc. v. Ragan*, 63 F.3d 438, 441 (5th Cir. 1995).

**B.    The Defendants' Summary Judgment Evidence**

In support of their motion for summary judgment, the Defendants have filed the following exhibits:

Appendix pp. 1-45: Relevant Portions of Jimenez's Medical Records with Business Records Affidavit Attached

Appendix pp. 46-50: Affidavit of Ernestine Julye, M.D.

Appendix pp. 51-58: Relevant Portions of Jimenez's Classification Records, with Business Records Affidavit Attached

Appendix pp. 59-62: No Records Affidavits

Appendix pp. 63-65: Safety Report with Business Records Affidavit Attached

Appendix pp. 66-69: Affidavit of Roberta Burt

Appendix pp. 70-73: Relevant Portions of Roberta Burt's Personnel Records, with Business Records Affidavit Attached

Appendix pp. 74-77: Affidavit of Beverly Thomas

Appendix pp. 78-80: Affidavit of Robin Hudson

Appendix pp. 81-83: Affidavit of Hung Dao, M.D.

Appendix pp. 84-87: Affidavit of Joseph Blanton

(Docket Entry No. 35, Defendant's Motion for Summary Judgment, Appendices).

The Defendants assert their entitlement to qualified immunity on the grounds that Jimenez has failed to allege a constitutional violation and that the Defendants' actions were objectively reasonable in light of clearly established law. (Docket Entry No. 35, Defendants' Motion for Summary Judgment, pp. 19-20). This court analyzes the Defendants' motion and the summary judgment evidence under the applicable law.

## III.   The Claims Against the Defendants in Their Individual Capacities

Qualified immunity shields government officials from liability when they are acting within their discretionary authority and their conduct does not violate clearly

established statutory or constitutional law of which a reasonable person would have known. *Gates v. Texas Dept. of Protective and Regulatory Services*, 537 F.3d 404 (5th Cir. 2008) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *Wallace v. County of Comal*, 400 F.3d 284, 289 (5th Cir. 2005). In performing the qualified immunity analysis, the first question the court must ask is whether, taken in the light most favorable to the plaintiffs, the facts alleged show that the officer's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Aucoin v. Haney*, 306 F.3d 268, 272 (5th Cir. 2002). If no constitutional right would have been violated were the allegations established, the inquiry ends. *Saucier*, 533 U.S. at 201. If, however, the plaintiff alleges the violation of a constitutional right, the court must then determine whether the right was clearly established at the time of the incident at issue. *Id.*; *Aucoin*, 306 F.3d at 272. A right is clearly established when its contours are "'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Wooley v. City of Baton Rouge*, 211 F.3d 913, 919 (5th Cir. 2000)(quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Finally, if the law was clearly established, the court must decide whether the defendant's conduct was objectively reasonable. *Aucoin*, 306 F.3d at 272; *see also Harlow*, 457 U.S. at 818. The court considers an official's conduct to be objectively reasonable unless all reasonable officials in the defendant's circumstances would have then known that the

conduct violated the Constitution. *Hampton v. Oktibbeha County Sheriff Dep't*, 480 F.3d 358, 363 (5th Cir. 2007).

In the summary judgment context, a government official need only plead qualified immunity, which then shifts the burden to the plaintiff. *Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005). The plaintiff must rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law and that genuine issues of material fact exist regarding the reasonableness of the official's conduct. *Id*. Because the individual defendants have asserted their entitlement to qualified immunity, Jimenez bears the burden of overcoming that defense.

## A.     The Claim Based on a Failure to Protect

Jimenez claims that Officer Burt was the picket officer responsible for opening and closing cell doors. He claims that she trapped him in a cell door as he was exiting a cell. To establish a failure-to-protect claim under 42 U.S.C. § 1983, a prisoner must show that he has been incarcerated under conditions posing a substantial risk of serious harm and that prison officials were deliberately indifferent to his need for protection. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Neals v. Norwood*, 59 F.3d 530, 532 (5th Cir. 1995). To act with deliberate indifference, a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

Only deliberate indifference will suffice to state a failure-to-protect claim; mere negligence is not sufficient. *See id.*; *see also Oliver v. Collins*, 914 F.2d 56, 60 (5th Cir. 1990) (holding that a negligent failure to protect from harm does not make a claim under 42 U.S.C. § 1983). The summary judgment evidence shows that Officer Burt was employed as a Correctional Officer III and worked as the Picket Officer at the Byrd Unit. (Docket Entry No. 35, Defendants' Motion for Summary Judgment, Appendix, pp. 66-68). She testified that:

> I am employed by Texas Department of Criminal Justice (TDCJ) as Sergeant at the Byrd Unit. I have been employed by TDCJ for approximately 5 years. I have held the rank of Sergeant of Correctional Officers for one year. In January of 2004, and at all times relevant to this lawsuit, I was employed as a Correctional Officer III at the Byrd Unit. I am a defendant in the above referenced lawsuit. I am aware that inmate Frank Jimenez, TDCJ #1013080, is suing me for violating his constitutional rights under the Eighth Amendment. I understand that Mr. Jimenez alleges I maliciously and sadistically inflicted harm on him by purposely closing him in a cell door. I deny that I have ever maliciously and sadistically inflicted harm on Mr. Jimenez. I further deny that I closed a cell door on him, either purposely or accidentally. I understand offender Jimenez is alleging that on or around January 6, 2004, I ordered him into a cell to remove a mattress, and then I purposely closed the door on him and held the door closed on him for several minutes, causing injury to his back and knee. I have no knowledge of this alleged incident, or any incident where Mr. Jimenez was injured on my watch. During January of 2004, I did work as picket boss at the Byrd Unit on the section where Mr. Jimenez worked as an orderly, or

SSI. I vaguely remember this offender, and it is possible that I ordered him into a cell to remove a mattress. The Byrd Unit is primarily a transient unit, and SSIs are often asked to move mattresses to accommodate a new transfer to the facility. The cell doors on the Byrd Unit are an older model of door, and they open and close manually. The doors are controlled by a pin and a crank. As picket officer, I am able to see down the cell doors and can usually see all the cell doors as they open and close. Per policy, each time I opened or closed a door I would loudly announce 'CLEAR THE DOORS, DOORS ARE OPENING' or 'CLEAR THE DOORS, DOORS ARE CLOSING' before I opened or closed the cell door. It was not uncommon for offenders to injure themselves in cell doors if they tried to force open a cell door before it had completely opened, or if they attempted to close a cell door. If an offender was injured on my watch, I would send them to the infirmary or call for medical if the injury was serious.  Additionally, I would notify my direct supervisor, and an accident report would be filled out regarding the incident.  If a cell door malfunctioned, I would initiate a maintenance request and notify my direct supervisor about the incident and an incident report would be completed.  Again, I have never intentionally closed a door on an offender, nor do I remember Mr. Jimenez ever being injured in a closing door. If the incident had occurred as Mr. Jimenez described, the incident would be documented. Grievance records, disciplinary records, incident reports, or emergency action records would exist that would support Mr. Jimenez's allegations. To my knowledge, there are no such records that exist.  I have no personal feelings towards Mr. Jimenez. I understand that he alleges I told him I hated him and would shoot him with a deer rifle. I did not tell Mr. Jimenez that I hate him, nor did I ever tell him I would shoot him with a deer rifle.  At all times, I took my duties as a Correctional Officer seriously and followed policy each time I opened or closed a cell door. I deny that I ever closed a

> door on Mr. Jimenez, either intentionally or accidentally.
> Furthermore, I deny I ever threatened to shoot Mr. Jimenez.
> I deny that I ever violated Mr. Jimenez's civil rights in any
> way. I performed my duties as a Correctional Officer to the
> best of my abilities and with a good faith belief that my
> actions were in accordance with the Constitution and the
> laws of the United States.

(Docket Entry No. 35, Defendants' Motion for Summary Judgment, Appendix, pp. 66-

69).

The summary judgment evidence shows that there are no Accident Reports,

Incident Reports, or any other official records involving Officer Burt or Jimenez in

January, 2004. (Docket Entry No. 35, Defendants' Motion for Summary Judgment,

Appendix, pp. 59-62).  Major Blanton testified that:

> I have no personal feelings towards Mr. Jimenez. I have
> never taken any actions against him, nor have I retaliated
> against him in any way. Mr. Jimenez seems to think I acted
> with others to prevent him from getting medical care or to
> cover up wrongdoing by staff members. I deny that this ever
> happened. If Sergeant Burt had in fact injured offender
> Jimenez as he claims, there would have been an
> investigation. This investigation would be included in the
> offender's classification file and possibly in the staff
> member's personnel file if the allegations were supported by
> evidence.

(Docket Entry No. 35, Defendants' Motion for Summary Judgment, Appendix, p. 86).

Keith Clendennen testified that there were no use of force reports for Jimenez

in January 2004 at the Byrd Unit. (Docket Entry No. 35, Defendants' Motion for

Summary Judgment, Appendix, p. 60).   Martha Cooper, Clerk for the Emergency

Action Center of the TDCJ, testified that she found no records of any incidents relating

to Jimenez in January 2004 at the Byrd Unit. (Docket Entry No. 35, Defendants'

Motion for Summary Judgment, Appendix, p. 61).   Diane Kukua, Senior Warden of the

Byrd Unit, testified that she found no records of incident reports involving Jimenez.

(*Id*. at 62).

Tanya L. Tucker, Safety Officer I at the Byrd Unit, testified that she was the

custodian of records for risk management at the Byrd Unit, and she found a Supervisor

Report on Inmate Injury dated January 7, 2004 showing that Jimenez was working as

a wing orderly and was removing a mattress from a cell when the cell door closed on

his back.   (*Id*. at 64).   The investigating officer noted that Jimenez did not report his

injury to the shift supervisor.   Instead, Jimenez reported the incident to the medical

department on January 7, 2004.   The investigating officer noted that inmates are

required to report injuries to supervisors immediately.  The Staff/Offender Injury report

showed the accident took place on January 6, 2004 and was not the result of a use-of-

force incident.   The injury was work-related.   Jimenez complained of back and knee

pain. The absence of official reports and the notation on the safety report show Officer

Burt did not injure Jimenez and that she was not aware that Jimenez was ever injured.

Personnel and disciplinary records for Defendant Burt show that Defendant Burt was

promoted from CO III to CO IV in December, 2005 and promoted to Sergeant in April, 2007. (Docket Entry No. 35, Defendants' Motion for Summary Judgment, Appendix, pp. 70-73). Officer Burt's personnel and disciplinary records do not show that she was ever disciplined about an incident involving Jimenez. There is no evidence to show that Officer Burt ever injured Jimenez or ever endangered Jimenez's safety. Officer Burt is entitled to summary judgment.

Jimenez next claims that Major Blanton and Captain Thomas acted to "cover up" Burt's actions and that they failed to protect him from harm. Jimenez does not allege that he was at a risk of being harmed, that Major Blanton and Captain Thomas knew of that risk, and that they ignored that risk. Instead, Jimenez complains that Major Blanton and Captain Thomas did not properly discipline Officer Burt *after* she allegedly harmed Jimenez. Such actions would amount to negligence. Jimenez claims that these supervisory officials failed to protect him from Officer Burt's trapping Jimenez in the cell door on January 6, 2004. Jimenez does not show that he received a threat from Officer Burt or that he asserted a need for protection from Officer Burt. Under these circumstances, Jimenez's general allegation that Major Blanton and Captain Thomas failed to protect him by covering up for Officer Burt's conduct rises only to the level of mere negligence, if anything, and is not sufficient to state a failure-to-protect claim. *See Farmer*, 511 U.S. at 837; *Neals v. Norwood*, 59 F.3d 530,

533 (5th Cir. 1995)(concluding that allegations amounting to a claim of negligence in the failure-to-protect context did not raise a non-frivolous constitutional claim); *Oliver v. Collins*, 914 F.2d 56, 60 (5th Cir. 1990)(holding that a negligent failure to protect from harm does not make a claim under 42 U.S.C. § 1983).

Alternatively, Jimenez's claims against Major Blanton and Captain Thomas are based on their positions as supervisors. Individual liability under section 1983 may not be based on a supervisor's vicarious liability for the acts or omissions of employees. *Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528, 534 (5th Cir. 1997). Supervisory officials may be liable if their own action or inaction, performed with a certain degree of gross negligence or deliberate indifference, proximately causes a constitutional violation. *Thompson v. Upshur County, Texas*, 245 F.3d 447, 459 (5th Cir. 2001). To establish individual liability for these prison officials, Jimenez would have to show either (1) personal involvement in the alleged wrongful acts or (2) that these defendants implemented a policy that resulted in deprivation of Jimenez's constitutional rights. *Cronn v. Buffington*, 150 F.3d 538, 544 (5th Cir. 1998). The court first considers the issue of personal involvement by these Defendants. Jimenez has not alleged or offered any summary judgment evidence suggesting that either Major Blanton or Captain Thomas was personally involved in the cell door incident. As noted, a supervisor may be held liable if he is either personally involved in the constitutional deprivation or there

is a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. *Alton v. Texas A & M Univ.*, 168 F.3d 196, 200 (5th Cir. 1999); *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987).  To prevail against a supervisory official, the plaintiff must demonstrate that the official's act, or failure to act, either caused or was the moving force behind the plaintiff's harm. *Smith v. Brenoettsy*, 158 F.3d 908, 911 (5th Cir. 1998).  The supervisor's conduct must be measured against the standard of deliberate indifference. *Alton*, 168 F.3d at 200.  "For an official to act with deliberate indifference, 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Brenoettsy*, 158 F.3d at 912.  "The standard of deliberate indifference is high." *Id.* (citing *Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 218 (5th Cir. 1998)).  Jimenez does not allege that Major Blanton and Captain Thomas were aware of and disregarded a substantial risk to Jimenez's safety. Jimenez does not claim that Major Blanton and Captain Thomas implemented a policy so deficient that the policy itself acted as a deprivation of constitutional rights. *Cronn*, 150 F.3d at 544. Jimenez has not shown there is a sufficient causal connection between the acts of Major Blanton and Captain Thomas and the constitutional violation sought to be redressed.  The claims against Major Blanton and Captain Thomas are dismissed.

**B.    The Claim Based on Denial of Medical Care**

Deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment, whether the indifference is manifested by prison doctors or by prison guards in intentionally denying or delaying access to medical care. *Harris v. Hegmann,* 198 F.3d 153, 159 (5th Cir. 1999); *Estelle v. Gamble,* 429 U.S. 97 (1976). "Deliberate indifference is an extremely high standard to meet." *Domino v. Texas Dep't of Criminal Justice,* 239 F.3d 752, 756 (5th Cir. 2001). Deliberate indifference encompasses only the unnecessary and wanton infliction of pain repugnant to the conscience of mankind. *McCormick v. Stalder,* 105 F.3d 1059, 1061 (5th Cir. 1999). To satisfy the exacting deliberate indifference standard, a defendant's conduct must rise "to the level of egregious intentional conduct." *Gobert v. Caldwell,* 463 F.3d 339, 351 (5th Cir. 2006).

The United States Supreme Court has adopted "subjective recklessness as used in the criminal law" as the appropriate definition of deliberate indifference under the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825, 839-40 (1994). Under this definition, a prison official cannot be found liable under the Eighth Amendment unless the official knows of and disregards an excessive risk to inmate health or safety. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must draw the inference. *Farmer,* 511 U.S. at 837. Under exceptional circumstances, a prison official's knowledge of a

substantial risk of harm may be inferred by the obviousness of the substantial risk. *Id;* *Reeves v. Collins,* 27 F.3d 174 (5th Cir. 1994). Medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference. *See Varnado v. Lynaugh,* 920 F.2d 320 (5th Cir. 1991).

The courts have set a high standard to raise a fact issue as to deliberate indifference. A claim that prison medical personnel made an incorrect diagnosis does not state a claim for deliberate indifference. *Domino v. Texas Department of Criminal Justice,* 239 F.3d 752, 756 (5th Cir. 2001) (citing *Johnson v. Treen,* 759 F.2d 1236, 1238 (5th Cir. 1985)). Similarly, the decision whether to provide additional or different treatment "is a classic example of a matter for medical judgment." *Estelle,* 429 U.S. at 107. The "failure to alleviate a significant risk that [the official] should have perceived, but did not" is insufficient to show deliberate indifference. *Farmer,* 511 U.S. at 833.

"Disagreement with medical treatment does not state a claim for Eighth Amendment indifference to medical needs." *Norton v. Dimizana,* 122 F.3d 286, 292 (5th Cir. 1997). Rather, the plaintiff must allege and raise a fact issue as to whether prison officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Johnson,* 759 F.2d at 1238.

Dr. Dao testified:

> When I treated Mr. Jimenez for his knee injury on April 27,
> 2004, he did not indicate that his injury was the result of
> being closed in a cell door. At that time, Mr, Jimenez
> complained that he had injured his left knee when he fell
> off his bunk that morning.   He requested that his
> classification be changed to indicate "lower bunk only." I
> examined his left knee and noted no edema or effusion, in
> other words, no indication of injury. There was no bruising
> or swelling of the knee and the area appeared normal and
> intact, Mr. Jimenez had good range of motion in his knee
> and no other indication of a medical problem. His medical
> records revealed that he had been complaining of knee
> problems since January, and that at that time, he
> complained of being caught in a closing cell door. His
> medical records revealed that his knee and back were x-
> rayed at that time and appeared within normal limits and
> without signs of injury. During my examination on April
> 27, 2004, I could find nothing medically to justify the pain
> that Mr. Jimenez reported having in his left knee, so I
> referred him out for an x-ray. The x-ray further revealed no
> indication of injury. I reviewed Mr. Jimenez's medical
> records again on April 30,2004. He Indicated that he had
> lost his job within the unit because of a medical restriction,
> no climbing, and asked that the medical restriction be
> removed so he could get back his job. I removed the
> medical restriction.  Sometime after that, Mr. Jimenez was
> transferred to another facility and I did not treat him again.

(Docket Entry No. 35, Defendants' Motion for Summary Judgment, Appendix, pp.

82-83).

Dr. Ernestine Julye, M.D., gave the following expert testimony:

meniscus injury, cartilaginous structures that line the top of the tibia and seat the femur, does not always lead to surgery unless the knee is locked or unstable. Over the days, months, and years, the patient was not noted to have this kind of deterioration.

The patient wrote a January 8, 2004 sick call request stating that he wants to be seen for back and left knee pain. The nursing note on January 9, 2004 charts that the patient felt that the medications were not working and that he wanted something stronger and more time off from work. The patient wrote a January 24, 2004 sick call request stating that he wanted to be seen for left knee pain. Methocarbamol and an elastic knee sleeve are issued at the subsequent January 26, 2008 clinic visit. The patient wrote a February 3, 2004 sick call request stating that his left knee hurt. The physician assistant clinic visit notes that he had a normal gait, no swelling, no apparent ligament instability, and normal xrays. Motrin was ordered. His February 18,2004 sick call request simply stated, "ya, my knee, around 12:30, thanks." The physician assistant examination on February19, 2004 found no crepitus noise, no laxity or instability with anterior drawer test. The physician exam by Dr. Dao on April 27,2004 documents the same, also adding that he had good range of motion. May 2004 and later April 2006 plain xrays of the knees show no acute bone pathology and articular relationships intact. At that visit the physician also charts that there was no longer need for crutches and that the patient's requests for low bunk were not indicated. He was ordered Motrin at that time. There is an[sic] chart review physician notation on April 30, 2004 where Dr. Dao notes that the patient complained to the clinic administrator that the patient wanted the job back that he had lost his job due to a "no climbing" restriction on his medical records, and that he wanted that restriction removed so he could return to that job assignment. The physician accommodated that request to return to the patient's previous level of activity. It would seem that the patient is volunteering that

he has improvement. The next time the patient reports a problem with his knee is when he writes a November 2004 sick call request asking for Motrin for pain and then again in February 2005. A different physician from a different unit, the Estelle Unit, notes in February 2005 that there are no abnormal physical findings. The rest of the record is scant with complaints of knee pain. Psychiatric issues of fear of poison in his food, fear of pesticides being poured on him by the guards, fear of even his mind being poisoned in his sleep dominate the record. He was psychiatrically unassigned in October 2005 for about 2 months. In March 2006 yet another different physician on the Wayne Scott Unit sees the patient for complaints of knee pain that the patient relates to the same injury with the cell door and the physician's findings are that he has some "popping of the patella," negative anterior drawer test, and stable collateral ligaments. Dislocation of the patella, or knee cap, was not described.

In summary, based on my review of the materials provided, and my training, education, and experience as a physician, Offender Jimenez received timely and reasonable care for his knee injury. The sick call request process was administered with punctuality by the clerical and administrative staff at the Byrd unit so that he reached nurses, physician assistants, and physicians with good timing. Repeated visits with different physician assistants and physicians brought no new deterioration of complaints; and physical exams by different physicians on different units offered similar benign findings. My opinions are based on a review of the materials provided and a reasonable medical probability.

(Docket Entry No. 35, Defendants' Motion for Summary Judgment, Appendix, pp. 46-

50).

Jimenez has failed to show that the Defendants were aware he faced a substantial risk of serious harm and disregarded the risk by failing to take reasonable measures to abate it. Jimenez's complaint stems from his disagreements with correctional officials over the proper course of treatment for his knee pain. Jimenez has failed to show that prison officials acted with deliberate indifference to his medical needs by denying him a referral to an orthopedic specialist. Nothing in the summary judgment evidence suggests that the Defendants were deliberately indifferent to Jimenez's knee condition. Jimenez has not pointed to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial.

The summary judgment evidence shows that Jimenez was seen by medical personnel on numerous occasions for complaints of knee pain; that the medical personnel evaluated his condition; and that he was provided with medical care. Medical personnel examined Jimenez, performed diagnostic procedures, and prescribed medications. The summary judgment evidence shows that Jimenez received the following treatment:

(1)     January 7, 2004: Jimenez was seen in the Byrd Unit infirmary for complaints of "being hit in the back by cell door last night." (Docket Entry No. 35, Defendants' Motion for Summary Judgment, Appendix, p. 2). He complained of muscle spasms, nausea, dizziness, and twitching eyes. Nursing staff noted that Jimenez was ambulating

without any problems, and referred him to a mid-level provider. (*Id.*).   He was prescribed Motrin.   (*Id.* at 3).

(2)   January 7, 2004:   Jimenez was examined by Physician's Assistant Curry who noted that Jimenez complained of knee, back, and neck pain and was requesting pain medication. (Docket Entry No. 35, Defendants' Motion for Summary Judgment, Appendix, pp. 4-6).   Physician's Assistant Curry noted "working diagnosis" of contusion, or possible bruising, to right knee and spine, but noted no visible injuries to left knee. (*Id.*).   Physician's Assistant Curry ordered x-rays, Ibuprofen, muscle relaxers, and a 48-hour cell pass allowing Jimenez to rest. (*Id.*).   The x-rays taken at that time revealed no indication of injury (no recent fracture, no bone pathology, everything within normal limits). (*Id.* at 7).

(3)   January 8, 2004: Jimenez placed a sick call request indicating pain in his back and left knee.   He said he had had the problem for four days.   He was scheduled for an appointment the following day, January 9, 2004. (Docket Entry No. 35, Defendants' Motion for Summary Judgment, Appendix, p. 8).

(4)     January 9, 2004: During his visit with Nurse Tyler, Jimenez stated that he

wanted more time off work and wanted "something stronger" for the pain. (*Id.* at 10).


(5)     January 24, 2004:  Jimenez placed another sick call request stating that his left

knee was in pain. (*Id.* at 11).


(6)     January 26, 2004: He was seen by a nurse cell-side.  The nurse re-filled his pain

medication and issued him an elastic sleeve for his knee. (*Id.* at 12).


(7)     February 3, 2004: Jimenez placed another sick call request and was scheduled

for an appointment the following day. (*Id.* at 13).


(8)     February 4, 2004: The nurse noted that the injury occurred one month ago and

Jimenez currently had no physical signs of injury, however she did refer him to a mid-

level provider. (Docket Entry No. 35, Defendants' Motion for Summary Judgment,

Appendix  pp. 13-15).


(9)     February 4, 2004: Physician's Assistant Aschberger noted that Jimenez was

demanding to see an orthopedic specialist and was disruptive in the clinic. (*Id.* at 16).

He noted that Jimenez's gait was normal; no knee contusion; no evidence of knee instability.

(10)   February 16, 2004: Jimenez filed a sick call request complaining of knee pain. He was scheduled for an appointment.

(11)   February 18, 2004: Physician's Assistant Curry noted that the examination done at that time revealed "no crepitus, laxity, or drawer sign," in other words, no sounds or signs of ligament damage or internal injury.

(12)   February 19, 2004: Nurse Smith noted that Jimenez complained of knee pain. She noted that he ambulated without problems.  (Docket Entry No. 35, Defendants' Motion for Summary Judgment, Appendix, pp. 46-49).   Jimenez continued to be prescribed pain medication for the discomfort of which he complained. (*Id.*).

(13)   April 26, 2004: Jimenez submitted another sick call request in which he complained that his knee was giving him trouble when he climbed on the top bunk. (*Id.* at 23).  He was scheduled for an appointment.

(14)    April 27, 2004: Jimenez reported to security that he had fallen from the top bunk and could not walk. (Docket Entry No. 35, Defendants' Motion for Summary Judgment, Appendix, pp. 25-28). He was placed in a wheelchair and brought to the infirmary where he was examined by nursing staff. (*Id.*). Although Jimenez claimed to have fallen from his top bunk onto his knee, nursing noted that there was no bruising, no redness, no swelling, and no signs of injury. (*Id.*). Jimenez insisted that he couldn't move his knee and needed crutches and also demanded a "low bunk pass." (*Id.*). He was issued crutches, given pain medication, and scheduled to see Dr. Dao. (*Id.*).

(15)    April 27, 2004: Dr. Dao examined Jimenez's knee for the first time. Jimenez complained of injuring his knee that morning. Dr. Dao noted that the left knee had no edema or effusion. (*Id.* at 29-30). At the time Dr. Dao examined Jimenez, Jimenez reported his injury resulting from falling from his bunk, not from being caught in a cell door. Dr. Dao found no visible signs of injury, including no swelling, no apparent ligament sprain or damage, and noted that Jimenez had good range of motion. (*Id.*) Based on his findings of no injury, Dr. Dao discontinued the crutches and did not issue Jimenez a low bunk pass. (*Id.*). Dr. Dao could find nothing physically wrong with Jimenez, but did refer him to radiology for more x-rays.(*Id.*).

(16)   April 28, 2004: Jimenez filed a sick call request complaining of knee pain.

(17)   April 28, 2004: Jimenez complained of knee pain and requested a low bunk. Zero edema present.  Physician's Assistant Curry found no indication for a low bunk. He referred Jimenez to John Sealy for a tele-med evaluation.  Order x-rays.  (*Id.* at 32-33).

(18)   April 30, 2004: Jimenez complained that he would lose his job because of the no climbing restriction. (*Id.* at 36).  Dr. Dao discontinued the restriction on climbing. (*Id.* at 37)

(19)   May 3, 2004: Jimenez's knee was x-rayed again, and the x-rays revealed that there was no injury. (*Id.* at 34).

(20)   July 20, 2004: Jimenez complained of knee pain while at the Lynaugh Unit.  Dr. Tally noted the examination and x-rays were within normal limits.

(21)   August 9, 2004: The Texas Tech Utilization Management noted that Jimenez's current knee x-ray was within normal limits, and his current physical assessment was

completely within normal limits.  (*Id*. at 39).  There was no indication for a specialty referral.

(22)   September 3, 2004: The Regional Medical/Dental Director agreed with Dr. Tally's decision to deny referral to an orthopedic specialist.

(23)   February 21, 2005: Jimenez was examined by Nurse Walker.   Jimenez complained of knee pain.  He complained that he missed his orthopedic appointment that had been scheduled in Galveston.  Jimenez requested new referral to Galveston.

(24)   February 22, 2005: Jimenez's bilateral knee exam was normal.   Medical personnel noted that referral was not indicated.  (*Id*. at 42).

(25)   March 16, 2005: referral was not indicated. (*Id*. at 42).  He was scheduled for appointment with a physician.

(26)   March 21, 2005: Jimenez complained of knee pain.  Medical personnel noted that referral was not indicated based on provider's evaluation. Dr. Khoshdel noted that Jimenez had been seen on February 22, 2005 and bilateral knee exam was normal.

(27)   March 29, 2005: Jimenez complained of knee pain.  Requested to see Nurse Frosty.

Although the court must consider the evidence with all reasonable inferences in the light most favorable to Jimenez, the non-movant, Jimenez, must produce specific facts to demonstrate that a genuine issue exists for trial. *Webb v. Cardiothoracic Surgery Associates of North Texas,* 139 F.3d 532, 536 (5th Cir. 1998).  Jimenez must go beyond the pleadings and use affidavits, depositions, interrogatory responses, admissions, or other evidence to establish a genuine issue. *Id.*  The mere existence of a scintilla of evidence in support of Jimenez's position is insufficient to defeat a properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).  Two opposing conclusory affidavits do not preclude summary judgment. *Travelers Ins. Co. v. Liljeberg Enter., Inc.,* 7 F.3d 1203, 1207 (5th Cir. 1993).

The summary judgment record does not raise a fact issue as to deliberate indifference to medical needs.  The facts Jimenez alleges as to the treatment he received preclude a finding that the medical care provided violated his constitutional rights.  Jimenez's medical records show that medical personnel monitored his condition, examined him on numerous occasions, and responded with medication and treatment.  Jimenez's medical records negate his claim of deliberate indifference

because his numerous sick call requests were answered promptly, he was seen by medical personnel, and his complaints were addressed.  Jimenez's medical records reveal numerous examinations by nurses, physician's  assistants, doctors, and radiologists.  Medical personnel at different units evaluated Jimenez's knee over a period of fifteen months.  Medical personnel never found any evidence of any injury to Jiminez s knee.  Yet, they repeatedly prescribed pain medication.  Because Jiminez's medical records indicate that he was consistently seen and treated, he cannot support his claim of deliberate indifference.  To the extent he complains that he did not receive more aggressive, earlier, or different treatment, such complaints are, as a matter of law, inadequate to support a deliberate indifference showing.

Jimenez has offered no evidence showing that the Defendants knew of and disregarded an excessive risk to Jimenez's health or safety.   Jimenez has not established that the Defendants were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and that the Defendants drew that inference.  The Defendants have established their entitlement to qualified immunity.  Jimenez has failed to come forward with any evidence, as is his burden, that there exist genuine issues of material fact as to whether the Defendants' conduct rose to the level of a constitutional violation. *See Pierce v. Smith,* 117 F.3d 866, 871-72 (5th Cir. 1997).  The Defendants are entitled to judgment as a matter of law on this claim.   The

Defendants' motion for summary judgment as to Jimenez's claim of deliberate indifference to his serious medical needs is GRANTED.

### C.    The Retaliation Claim

Jimenez claims that Defendants retaliated against him by cancelling his medical appointments. He claims that Officer Burt said she would be waiting at the gate when Jiminez was released from custody. She allegedly said she would shoot him if he ever sued her. Jiminez states that he refused to work because Dr. Dao, Officer Hudson, and Samarneh refused to help treat his knee. Jiminez claims he was denied treatment at various units.

Prison officials may not retaliate against an inmate because that inmate exercised his right of access to the courts or complained to a supervisor about a guard's misconduct. *Woods v. Smith,* 60 F.3d 1161, 1164 (5th Cir. 1995), *cert. denied,* 516 U.S. 1084 (1996). The prospect of endless claims of retaliation on the part of inmates would disrupt prison officials in the discharge of their most basic duties. Claims of retaliation must therefore be regarded with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in state penal institutions. *Woods,* 60 F.3d at 1166 (citing *Adams v. Rice,* 40 F.3d 72, 74 (4th Cir. 1994), *cert. denied,* 514

U.S. 1022 (1995)).  To assure that prisoners do not inappropriately insulate themselves from disciplinary actions by drawing the shield of retaliation around them, trial courts must carefully scrutinize these claims.

To prevail on a claim of retaliation, an inmate must establish: (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for exercising that right, (3) a retaliatory or adverse act, and (4) causation. *McDonald v. Steward*, 132 F.3d 225, 231 (5th Cir. 1998).  Causation requires a showing that "but for the retaliatory motive the complained of incident . . . would not have occurred." *Johnson v Rodriguez*, 110 F.3d 299, 310 (5th Cir. 1997)(quoting *Woods*, 60 F.3d at 1166), *cert. denied*, 522 U.S. 995, 118 S. Ct. 559 (1997).

Mere conclusory allegations of retaliation are insufficient to withstand a motion for summary judgment. *Woods*, 60 F.3d at 1166. "The relevant showing in such cases must be more than the prisoner's personal belief that he is the victim of retaliation." *Johnson v. Rodriguez*, 110 F.3d at 310 (internal quotation marks omitted).  "The inmate must produce direct evidence of motivation, or the more probable scenario, allege a chronology of events from which retaliation may be plausibly inferred." *Woods v. Smith*, 60 F.3d at 1166 (internal quotation marks omitted).

Jimenez states that he filed numerous complaints about the denial of treatment for his knee, and the Defendants were displeased with all the paperwork.  Jimenez

alleges that Defendants retaliated against him when they interfered with his medical treatment. He maintains that the Defendants retaliated against him by preventing him from being examined by medical personnel.

The summary judgment evidence shows that many of the Defendants did not have any control over an inmate's access to medical treatment. Major Blanton and Captain Thomas were ranking security officials. They did not have the authority to make medical decisions regarding inmates or to override medical directives. They had no control over the medical care that inmates received, other than to send the inmates to the infirmary if the inmates need medical care. App. at 74-77, 84-87. They were responsible for security, and TDCJ policy dictates that security cannot override medical. *Id.* Neither Major Blanton nor Captain Thomas had the authority to transfer Jimenez from the Byrd Unit to John Sealy Hospital to see an orthopedic surgeon. They did not have medical training or any control over medical decisions. They did not have the authority to prevent a referral if medical personnel had ordered one. *Id.*   Jimenez claims that Major Blanton and Captain Thomas wrote cases against him, changed his work status, and took other acts against Plaintiff because of the "hell raising" he was doing about his knee. The records show that Jimenez was charged with two major disciplinary offenses for refusing to work. As a result, his good-time earning class status was reduced from State Approved Trusty 3 to Line 3. The record further shows

that Jimerez had a history of refusing to obey orders. (Docket Entry No. 35, Defendants' Motion for Summary Judgment, Appendix, p. 58). Because of his disciplinary history, Jimenez's custody level was reduced from G2 to G4.(*Id.* at 85). Level G4 is considered a more serious custody level. The Byrd Unit only houses custody levels G1 and G2 and does not house offenders classified as level G4. (*Id.* at 85). Major Blanton testified that he did not transfer Jimenez to a different unit as an act of retaliation. Instead, he explains that Jimenez's custody level was dropped from G2 to G4. The Byrd Unit did not house custody level G4 inmates. Jiminez was transferred to a different unit that could hold custody level G4 inmates. (*Id.* at 86). Jimenez has not established that Major Blanton and Captain Thomas intended to retaliate against Jimenez for exercising his right to file grievances about medical care, a retaliatory or adverse act, or causation. He has not shown that but for the retaliatory motive, the complained of incident would not have occurred. Jimenez's conclusory allegations of retaliation are insufficient to withstand a motion for summary judgment. He offers no direct evidence of motivation. Nor does he present a chronology of events from which retaliation may be plausibly inferred. His retaliation claim against Major Blanton and Captain Thomas lacks merit, and the Defendants are entitled to judgment as a matter of law.

Jimenez next claims that Ms. Hudson often cancelled his medical appointments by tampering with computer records. The summary judgment evidence shows that Ms. Hudson was employed in a clerical capacity as a correctional clinical assistant, or "CCA." (Docket Entry No. 35, Defendants' Motion for Summary Judgment, Appendix 78-80). Her job duties included ordering supplies for the medical department, entering inmate's sick call requests into the computer, and notifying inmates of their appointment times after nursing or medical personnel set up appointments. *Id.* Ms. Hudson did not have medical training, she was not a nurse, and she did not determine who would receive medical treatment. *Id.* She explained that when an inmate placed a sick call request, nursing or medical personnel would then schedule an appointment based on inmate need and staff availability. *Id.* Ms. Hudson would then enter that information into the computer and notify the inmate of his appointment time. *Id.* Sick call requests went through nursing, and because Ms. Hudson was not a nurse, she could not override medical. *Id.* Jimenez's medical records show that Ms. Hudson entered several sick call requests, and they were answered. The summary judgment evidence shows that nursing made the final call on whether and when an inmate's sick call request would be answered. Ms. Hudson was not a nurse, so she could not have delayed or prevented Jimenez from receiving treatment.

Jimenez has not established that Ms. Hudson intended to retaliate against Jimenez for exercising a constitutional right, a retaliatory or adverse act, or causation. Jimenez has not shown that but for the retaliatory motive, the complained of incident would not have occurred. His conclusory allegations of retaliation are insufficient to withstand a motion for summary judgment. He offers nothing more than his personal belief that he is the victim of retaliation. His retaliation claim against Ms. Hudson lacks merit, and the Defendants are entitled to judgment as a matter of law.

Dr. Dao and Mr. Samarneh are the only Defendants who could have made decisions regarding Jimenez's medical care. Jimenez's medical records show that he was repeatedly examined for complaints of knee pain. Medical personnel examined him, performed diagnostic procedures, and prescribed medications. Medical personnel determined that a referral to an orthopedic surgeon was unnecessary because there was no medical evidence supporting Jimenez's claim of injury. App. at 38-40.

Jimenez has not established that Dr. Dao and Mr. Samarneh intended to retaliate against Jimenez for exercising a constitutional right, a retaliatory or adverse act, or causation. He has not shown that but for the retaliatory motive the complained-of incident, the alleged denial of medical care, would not have occurred. His conclusory allegations of retaliation are insufficient to withstand a motion for summary judgment.

Jimenez has not offered any competent evidence of a retaliatory motive on the part of the Defendants. Jimenez has not alleged a chronology of events from which retaliation may be plausibly inferred. The fact that one event follows another in time does not prove retaliation. *Enlow v. Tishomingo County, Miss.*, 45 F.3d 885, 889 (5th Cir. 1995). Jimenez's claims amount to nothing more than his personal belief that he was the victim of retaliation. Jimenez's conclusory allegations are insufficient to establish that the Defendants retaliated against him for exercising his right to complain about the denial of medical care.

Jimenez has not presented any evidence of a causal connection between his exercise of his constitutional right and the alleged retaliatory acts.

In *Morris v. Powell*, 449 F.3d 682, 685-86 (5th Cir. 2006), the Fifth Circuit considered, as a matter of first impression, whether an allegation of de minimis retaliatory acts can support a retaliation claim. The Fifth Circuit explained:

> The de minimis standard enunciated by our sister circuits is consistent with this court's precedent. The standard achieves the proper balance between the need to recognize valid retaliation claims and the danger of "federal courts embroil[ing] themselves in every disciplinary act that occurs in state penal institutions." *Woods*, 60 F.3d at 1166. The purpose of allowing inmate retaliation claims under § 1983 is to ensure that prisoners are not unduly discouraged from exercising constitutional rights. *See Crawford-El*, 523 U.S. at 588 n.10, 118 S. Ct. 1584. Some acts, though maybe motivated by retaliatory intent, are so de minimis that they

would not deter the ordinary person from further exercise of his rights. Such acts do not rise to the level of constitutional violations and cannot form the basis of a § 1983 claim.

We must explain, however, that this threshold is intended to weed out only inconsequential actions and is not a means to excuse more serious retaliatory acts by prison officials. Retaliation against a prisoner is actionable only if it is capable of deterring a person of ordinary firmness from further exercising his constitutional rights.

*Morris*, 449 F.3d at 686.

Jimenez insists that the Defendants retaliated against him by denying medical care. This court has already determined that Jimenez's claim based on the denial of medical care lacks merit. As noted, Jimenez complains that the Defendants retaliated against him by interfering with his ability to seek medical care for his knee. Specifically, he claims that the Defendants cancelled his medical appointments and communicated with one another about Jimenez's knee condition. Even if the Defendants' acts were somehow motivated by retaliatory intent, these acts are so de minimis that they would not deter the ordinary person from further exercise of his rights. These acts do not rise to the level of a constitutional violation and cannot form the basis of a § 1983 claim. Because Jimenez cannot show that the allegedly adverse act constituted more than a de minimis injury, he has failed to state a valid retaliation claim. As noted, retaliation against a prisoner is actionable only if it is capable of

deterring a person of ordinary firmness from further exercising his constitutional rights. The alleged denial of medical care by the Defendants did not prevent Jimenez from filing additional grievances and from instigating this lawsuit.

The Defendants' decisions concerning Jimenez's medical care were based on medical judgments.  The decision to transfer Jimenez to a different unit was based on security concerns within the institution.  There is no genuine issue of material fact concerning Jimenez's claim of retaliation.  Defendants are entitled to summary judgment.

### D.    The Conspiracy Claim

Jimenez asserts that prison officials engaged in a conspiracy to deny him medical care.  He mentions that Assistant Warden Goodwill and Warden Heuzell were responsible for the operation of the Byrd Unit.  He claims they acted in concert with other prison officials to prevent Jimenez from seeking medical care. (Docket Entry No. 2, pp. 1-2).

The elements of civil conspiracy are (1) an actual violation of a right protected under § 1983 and (2) actions taken in concert by the defendants with the specific intent to violate the aforementioned right.  *Cinel v. Connick,* 15 F.3d 1338, 1343 (5th Cir.), *cert. denied,* 513 U.S. 868 (1994).  A plaintiff who asserts a conspiracy claim under the civil rights statutes must plead the "operative facts" showing an illegal agreement;

"bald allegations" of an agreement do not suffice. *Lynch v. Cannatella*, 810 F.2d 1363, 1369-70 (5th Cir. 1987); *Arsenaux v. Roberts*, 726 F.2d 1022, 1023-24 (5th Cir. 1982). The plaintiff may, and often must, rely on circumstantial evidence, because conspiracies "are rarely evidenced by explicit agreements." *Mack v. Newton*, 737 F.2d 1343, 1350-51 (5th Cir. 1984) (quoting *Michelman v. Clark-Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1043 (2d Cir. 1976)).

Jimenez has not alleged facts showing illegal acts or that the defendants entered into an agreement to commit an illegal act. *Kerr v. Lyford,* 171 F.3d 330, 341-42 (5th Cir. 1999) (finding that the appellants' civil conspiracy claim was contingent on the success of their malicious prosecution claim).   Jimenez's bald allegations that the defendants conspired to deny him medical care do not state a constitutional violation. "It remains necessary to prove an actual deprivation of a constitutional right; a conspiracy to deprive is insufficient." *Gillum v. City of Kerrville*, 3 F.3d 117,  123 (5th Cir. 1993) (quoting *Villanueva v. McInnis,* 723 F.2d 414, 418 (5th Cir. 1984)).

Jimenez's conspiracy claim is DISMISSED as frivolous.

## IV.    The Claims Against Defendants in Their Official Capacities

Suits for damages against the state are barred by the Eleventh Amendment. *Kentucky v. Graham*, 473 U.S. 159, 169 (1985).   Absent waiver, neither a state nor agencies acting under its control are subject to suit in federal court. *Puerto Rico*

*Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993). This bar remains in effect when state officials are sued for damages in their official capacity. *Cory v. White*, 457 U.S. 85, 90 (1982). To the extent Jimenez sues the Defendants for damages in their official capacities, those claims are barred by the Eleventh Amendment.

The Eleventh Amendment does not bar Jimenez's claim for prospective relief. Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, the entity's "policy or custom" must have played a part in the violation of federal law. *Hafer v. Melo*, 502 U.S. 21, 25 (1991)(quoting *Monell v. Dept. of Social Servs. of New York*, 436 U.S. 658, 694 (1978)).

Jimenez has not demonstrated that a TDCJ-CID policy caused a violation of his constitutional rights. Jimenez's claims for injunctive relief lack merit. Defendants are entitled to judgment as a matter of law on this claim.

## V.    Conclusion

The Defendants' motion for summary judgment, (Docket Entry No. 35), is GRANTED. Jimenez's constructive motions for extension of time, (Docket Entry Nos. 41 & 42), are DENIED.

The Clerk will provide a copy of this order by regular mail, facsimile transmission, or e-mail to:

(1)     the TDCJ - Office of the General Counsel, Capitol Station, P.O. Box

13084, Austin, Texas, 78711, Fax: 512-936-2159;

(2)     the Inmate Trust Fund, P.O. Box 629, Huntsville, Texas 77342-0629,

Fax: 936-437-4793; and

(3)     the District Clerk for the Eastern District of Texas, 211 West Ferguson,

Tyler, Texas 75702, Attention: Manager of the Three-Strikes List.

SIGNED at Houston, Texas, on _____February 23_____, 2009.


_____
VANESSA D. GILMORE      .
UNITED STATES DISTRICT JUDGE